JOHNSON, Chief Justice
| ¡This medical malpractice case arises from the tragic death of Lyric Pitts, seven month old daughter of plaintiffs, David Pitts, Jr. and Kenyetta Gurley. Following trial of this matter,- the jury found in favor of defendant, Dr. Rhoda Jones. Plaintiffs moved for a Judgment Notwithstanding the Verdict (“jNOV”), or alternatively for a new trial. The district court granted the JNOV and conditionally granted the new trial. The court of appeal reversed and reinstated the -jury’s verdict. We granted plaintiffs’• writ application to review the correctness of the lower courts’ rulings on the JNOV and new trial. For the following reasons, we affirm the court of appeal’s ruling reversing the district court’s grant of the JNOV. However, we reverse the ruling of the court of appeal relative to the new trial, finding no abuse of discretion in the'district court’s grant of a new trial.
FACTS AND PROCEDURAL HISTORY
’ Kenyetta Gurley brought' her only child, seven month old infant daughter Lyric Pitts, to the Emergency Room (“ER”) at Hood Memorial Hospital on October 22, 2011, at approximately 6:20 p.m. reporting Lyric had thrown up twice that afternoon and had rapid breathing; she was breathing “funny” and faster than normal. Lyric was I?,triaged about 6:45 p.m. The chief complaints noted on the “Triage and Assessment” sheet in the medical records were “nausea and vomiting since 4 p.m., also wheezing.” Her pulse rate was recorded at 189. The triage nurse also noted Lyric’s skin as “dry” and “warm;” and *61 noted “wheezes” in lungs; and “labored” respirations.
Lyric was examined in the ER at approximately 7:30 p.m. by defendant, Dr. Rhoda Jones, who' noted shortness of breath and noted Ms. Gurley reported rapid breathing for 12 hours.[1] Upon examination of Lyric, Dr. Jones noted “wheezing in all lung fields” and “shortness of breath.” Dr. Jones ordered a chest x-ray, CBC (complete blood count), CMP (comprehensive metabolic panel) and a test for RSV (respiratory syncytial virus). She recorded her diagnosis in.the medical records as “asthma/possible RSV/possible pneumonia.” The “History and Physical Form” reflects the chief complaint upon presentation was “shortness of breath.” Further abnormal findings of “lethargy, wheezing in all lung fields and dry skin” were noted. The findings/diagnosis were noted as “asthma possible pneumonia and RSV.” According to the hospital’s intake and output record, Lyric had not had any liquid intake since 4:00 p.m. and had no output (i.e., dirty diaper) since 2:00 p.m.
According to the medical records, Lyric received a steroid injection at 8:05 p.m and was given a dose of Phenergan for nausea at 8:10 p.m. At 8:28 p.m., Lyric was sent to have the chest x-ray taken. The nursing assessment records indicate at 8:40 p.m Lyric’s pulse rate was 187 and respiration rate was 38. No nasal flaring was noted, but course breath' sounds were noted in her lungs. Blood was drawn at 9:25 p.m., and the lab report was received at 10:00 p.m. A late entry to the medical records was added by a nurse indicating that an- IV was attempted on Lyric with no success Rat 8:15 p.m. Additionally, at 10:25 p.m., Lyric was given a breathing treatment of Xopenex as well as an intramuscular shot of an antibiotic. The medical records also contain a late entry by the triage nurse indicating that at approximately 10:10 p.m. “ADON (assistant Director of Nursing) Karen Volkman here.- Told ADON that Dr. Jones wants to admit pt., & I asked Dr. Jones at least 3x if we could .call 'another facility, Dr. Jones stated ‘no one will take pt. [with negative] labs & no fever.’-.... ADON states ‘Ok, I can see that.’ ”
The chest x-ray was normal, other than a tiny right lower lobe interstitial infiltrate.[2] Lyric’s heart size was normal. The test for RSV was negative. Dr. Jones admitted Lyric to the hospital at approximately 10:35 p.m. for observation and breathing treatments every six hours. The diagnosis remained asthma and possible pneumonia. At 10:35 p.m., Lyric’s pulse rate was recorded at 200 with respirations at 38. Nursing notes indicate the child was asleep; respirations were even and unla-bored with audible coarse breath sounds; left lung field sounds coarse; right lung field sounds diminished; no nasal flaring noted; mother advised child had not drunk any milk since 4:00 p.m. and had not had a wet or dirty diaper since 2:00 p.m. The nurses noted no acute distress and indicated they would continue to monitor the child.
The medical records further indicate that at 11:30 p.m. a nurse called Dr. Jones questioning the need for a blood culture per hospital policy for diagnosis of pneumonia. Dr. Jones stated her “primary diagnosis is asthma with only possible pneumonia. If I wanted blood cultures done I would have ordered it.”
At midnight, a nurse was called to the room by Ms. Gurley who reported that *62 Lyric had thrown up. The nurse noted in the chart that a small amount of clear to white saliva was noted over mothers shirt. Respirations were noted as even and Lunlabored; no acute distress noted. The mother was assisted to a shower and a hospital gown was supplied. At 12:45 a.m., the nurses noted another episode of spitting up a small amount, approximately 25 ml, of clear saliva. At 2:00 a.m. a nebulizer treatment was administered. The nurses notes also indicate a change in Lyric’s condition. Her respiration rate was recorded at 68 and the nurses noted she was moaning with every respiration; her breathing was noted to be “tacky” (i.e., fast).
By 2:30 a.m., Dr. Jones was called and she arrived in the room at approximately 2:40. a.m. The records reflect that at approximately 3:00 a.m., while Dr. Jones was holding Lyric, the child had seizure activity and stopped breathing. Dr. Jones called for the code cart and attempted to resuscitate the baby. At 3:51 a.m., the child was pronounced dead. The autopsy report showed the cause of death as myocarditis (inflammation of the heart muscle).
Plaintiffs instituted a medical malpractice action against Dr. Jones. The plaintiffs asserted Dr. Jones breached the standard of care for emergency room physicians because she failed to recognize Lyric was a “sick baby” and transfer her to a facility with a higher level of care.[3]
The Medical Review Panel (“MRP”) unanimously found Dr. Jones failed to meet the standard of care, reasoning:
The child presented, as documented in the record, as lethargic, significantly ta-chycardic and tachypneic. The child was quite ill and this was not recognized in a timely manner throughout her ED stay and hospitalization. The child was rapidly decompensating and resuscitation was not aggressively undertaken. She should have transferred the child to a facility providing a higher level of care and expertise. The panel cannot determine what role these breaches in the standard of care played in the child’s demise. Panel defers to the expertise of a pediatric intensivist or pediatric cardiologist for that determination.
LThe case proceeded to a jury trial, following which the jury ruled in favor of defendant by a vote of 9-3. Specifically, the jury found plaintiffs proved the standard of care, but failed to prove a breach of that standard. Pursuant to the instructions on the jury interrogatories form in light of the jury’s negative response to the interrogatory regarding whether plaintiffs proved Dr. Jones failed to comply with the standard of care, the jury did not reach the subsequent questions of causation or damages.
Plaintiffs filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. Following a hearing, the district court granted the JNOV and alternatively conditionally granted a new trial. In written reasons for judgment, the district court stated:
The jury just got it totally wrong in this case. I am of the opinion that they were completely confused as to the applicable standard of care of an emergency room physician at a semirural hospital. The medical review panel was crystal clear with their unanimous assessment that the defendant physician was not under *63 any obligation to properly diagnose with precision the specific illness or illnesses with which the child presented. The physician’s primary obligation was simply to recognize a very sick infant, and to immediately refer and transfer the child to a facility where proper care would be given. Under any scenario or interpretation of the facts, this the physician did not do. The medical records powerfully support that the child was very ill upon presentation based on the vital signs, documentation of nausea, vomiting, labored respirations, lethargy, loss of appetite and lack of eating, lack of drinking and lack of elimination which continued during the entire hospital stay. The emergency room nurse documented that on at least three occasions she urged the defendant physician to transfer the child to a higher care facility and the doctor failed to do so. This factor is very significant, considering the reluctance of inferior medical personnel to question the decision of any physician, much less three times in an emergency room setting. Instead, the defendant physician arrogantly admitted the child to her own grossly incompetent care. This unequivocal breach of standard of care caused prolonged suffering to the child and the death of the child. The child possessed a greater than fifty per cent chance of survival at the time of presentation to the emergency room. The parents, and certainly not the child, committed no act of contributory or comparative fault. The damages awarded are on the low end herein, but are within the realm of discretion.
|fiNo reasonable jury could have found otherwise than as stated herein. I belief [sic] the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice which must be remedied. A JNOV is designed to protect against arbitrary and unreasonable and biased juries, and is a proper vehicle to render justice herein. If not, then certainly a new trial is warranted.
The court of appeal reversed. Pitts v. Louisiana Medical Mut. Ins. Co., 15-0848 (La.App. 1 Cir. 6/3/16), 197 So.3d 221. After citing the law on JNOV and summarizing the evidence and testimony at trial, the majority stated:
After reviewing the evidence in this case, we are forced to disagree with the trial court’s conclusion that “[n]o reasonable jury could have found otherwise than as stated” in the trial court’s reasons for judgment. The jury was presented with conflicting expert testimony concerning Dr. Jones’s treatment of Lyric and whether it constituted a breach of the standard of care. The experts who testified on behalf of the plaintiffs, two of whom were on the original medical review panel, opined that Dr. Jones breached the standard of care in her treatment of Lyric; the physicians testifying on behalf of Dr. Jones did not agree. The experts also disagreed on whether Lyric’s condition was such that she should have been transferred by Dr. Jones immediately upon presentation to the emergency room. Again, while the experts testifying for the plaintiffs described Lyric as “quite ill” and “rapidly decompensat-ing,” Dr. Litner indicated that he found no evidence in the record warranting a transfer of Lyric to another facility for treatment. Given the considerable disagreement among the medical experts, a reasonable person could have conclud *64 ed that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial. Therefore, we conclude that the trial court’s granting of the motion for a JNOV constituted legal error and must be reversed.
Id. at 234-35. The court of appeal similarly found no basis to support the conditional grant of a new trial:
In reversing the trial court’s grant of a JNOV, we determined that the evidence in the record supported the jury’s verdict that the plaintiffs had failed to prove that Dr. Jones breached the emergency medicine standard of care in her treatment of Lyric. We further found that the jury’s verdict was reasonable, given the diverse opinions expressed by the medical experts. Thus, the jury’s verdict was supportable by any fair interpretation of the evidence. Therefore, the plaintiffs were not entitled 17to a new trial on the basis that the jury’s verdict was contrary to the law and the evidence.
Id. at 237 (internal citations removed). Judge McClendon concurred, stating “while I may agree with the trial court’s interpretation of the evidence, in light of the rigorous standard in reviewing a JNOV, I am constrained to find that the JNOV was improperly granted. Further, with regard to the motion for new trial, based on the totality of the evidence presented, I am unable to conclude that the jury’s verdict was not supported by any fair interpretation of the evidence.” Id. Judge Welch dissented without reasons and Judge Higginbotham dissented, stating “my review of the record reveals the jury was confused and applied the wrong standard of care to the emergency room doctor. Thus, I would affirm the JNOV ruling.” Id. at 238.
Plaintiffs filed a writ application in this court, which we granted. Pitts v. Louisiana Medical Mutual Insurance Company, 16-1232 (La. 11/15/16), 209 So.3d 104
DISCUSSION
A JNOV is a procedural device authorized by La. C.C.P. art. 1811, by which the trial court may modify the jury’s findings to correct an erroneous jury verdict. Wood v. Humphries, 11-2161 (La. App. 1 Cir. 10/9/12), 103 So.3d 1105, 1109, writ denied, 12-2712 (La. 2/22/13), 108 So.3d 769. The criteria for granting a JNOV was jurisprudentially provided by this court in Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La. 1986). More recently, this court summarized the standard for a JNOV in Joseph v. Broussard Rice Mill, Inc., 00-0628 (La. 10/30/00), 772 So.2d 94:
As enunciated in Scott, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied | Rif there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the princi- *65 pie that “[w]hen there is a jury, the jury is the trier of fact.”
772 So.2d at 99 (internal citations removed). On appellate review of a JNOV, the court must first determine whether the trial judge erred in granting the JNOV. by using these criteria in the same way as the trial judge in deciding whether to grant the motion. VaSalle v. Wal-Mart Stores, Inc., 01-0462 (La. 11/28/01), 801 So.2d 331, 339. “That is, the court must determine whether the ‘facts and inferences point so strongly and overwhelmingly in favor, of the moving party that reasonable persons could not arrive at a contrary verdict.’ If reasonable persons might reach a different conclusion, then the trial judge erred in granting the motion and the jury verdict should be reinstated.” Id.
Considering the rigorous standard for a JNOV and that the district court was not allowed to evaluate the credibility of the witnesses, after review of the record we find no error in the court of appeal’s ruling setting aside the JNOV. As explained by the court of appeal, “given the considerable disagreement among the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial.” Pitts, 197 So.3d at 235.
 Although plaintiffs were not entitled to a JNOV, this does not necessarily preclude entitlement to a new trial. La. C.C.P, art. 1972 provides the peremptory grounds for a new trial: (1) when the verdict or judgment appears clearly contrary to the law and evidence, (2) when .the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before |flor during the trial, and (3) when the jury was bribed or has behaved improperly so that impartial justice has not been 'done. (Emphasis added). Additionally, La. C.C.P. art. 1973 provides the trial court with discretionary authority to grant a new trial “in any case if there is good ground therefor, except as otherwise provided by law.” When the: trial judge is convinced by his examination , of the. facts that the judgment would result in a miscarriage of justice, a new trial should be ordered pursuant to La. C.C.P; art. 1973. See Horton v. Mayeaux, 05-1704 (La. 5/30/06), 931 So.2d 338, 344; Lamb v. Lamb, 430 So.2d 51, 53 (La. 1983).
In this case, the district court provided essentially the same reasons for granting the JNOV and conditionally granting the new trial:
I belief (sic) the jury was confused by the testimony of the. defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice which must be remedied. A JNOV is designed to protect against arbitrary and unreasonable and biased juries, and is a proper vehicle to render justice herein. If not, then certainly a new trial- is warranted. (Emphasis added).
Although not explicitly stated, the district court’s reasons for granting a new trial can be reasonably construed as finding the verdict appears clearly contrary to the law and the evidence under Article 1972(1) and that there is a good ground therefor under Article 1973.
This, court has explained that a motion for a new trial requires a. less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right *66 to have all disputed issues resolved by a jury. Martin v. Heritage Manor S. Nursing Home, 00-1023 (La. 4/3/01), 784 So.2d 627, 631. Unlike the standard applicable to a JNOV, in considering whether to grant a new trial under La. C.C.P. art. 1972(1), a trial judge may evaluate the evidence without | ¶ flavoring either party, and draw its own inferences and conclusions. Id. at 637. Most significantly, the district court has authority to evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. Id.; Davis v. Wat Mart Stores, Inc., 00-0445 (La. 11/28/00), 774 So.2d 84, 93. However, because a motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations, the jury’s verdict cannot be set aside on that ground if it is supportable by any fair interpretation of the evidence. Id.
The applicable standard of review in ruling on a motion for new trial is whether the district court abused its discretion. Davis v. Witt, 02-3102 (La. 7/2/03), 851 So.2d 1119, 1181; Martin, 784 So.2d at 632. In reviewing the district court’s grant of a new trial under La. C.C.P. art. 1972(1), we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. Davis, 774 So.2d at 93. When the district court grants a new trial based on Article 1972(1), the jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. Martin, 784 So.2d at 637. Furthermore, this court has recognized that the district court has much discretion in determining whether a new trial should be granted pursuant to Article 1973. Lamb, 430 So.2d at 53; see also La. C.C.P. art. 1971, Official Comment (d). We have explained that, generally, “the only requirement has been that the district court state an articulable reason or reasons as to why he is exercising his discretionary powers.” Horton, 931 So.2d 338, 344 (internal citation removed). Unless an abuse of this discretion can be demonstrated, | na district court’s action in granting or denying a new trial on discretionary grounds will not be reversed. Id.
In reasons for judgment, the district court articulated the jury was “completely confused as to the applicable standard of care of an emergency room physician at a semirural hospital.” As explained by the district court, and supported by the record, “the defendant physician was not under any obligation to properly diagnose with precision the specific illness or illnesses with which the child presented. The physician’s primary obligation was simply to recognize a very sick infant, and to immediately refer and transfer the child to a facility where proper care would be given.” The district court further explained that the medical records supported the fact that Lyric “was very ill upon presentation to the ER based on the vital signs, documentation of nausea, vomiting, labored respirations, lethargy, loss of appetite and lack of eating, lack of drinking and lack of elimination which continued during the entire hospital stay.” The court found it very' significant that “the emergency room nurse documented that on at least three occasions she urged the defendant physician to transfer the child to a higher care facility and the doctor failed to do so.” After review of the record, we find no abuse of the district court’s discretion in granting a new trial under either Article 1972(1) or Article 1973.
*67 As we previously explained, in considering whether to grant a new trial pursuant to Article 1972(1), the district court was permitted to weigh the evidence and make credibility determinations, and was not required to view the evidence in the light most favorable to Dr. Jones. It was undisputed at trial that the standard of care for an emergency room physician did not require Dr. Jones to diagnose Lyric with myocarditis. Rather, an emergency room physician is only required to recognize a “sick” patient and transfer the patient to a higher care facility. The primary issue at 112trial was whether Lyric presented as “sick,” such that she should have been transferred to another facility.
Dr. James Crowell testified on behalf of the plaintiffs. Dr. Crowell served on the MRP and testified as an expert in emergency room medicine. According to Dr. Crowell, Lyric presented to the ER as lethargic, significantly tachycardic and ta-chypneic. He explained:
“lethargic” implies a listless, weak energetic, just a sick looking presentation. Significantly tachycardic would mean the heart rate was fast, the baby’s heart rate was higher than one would expect at rest. And tachypneic refers to the breathing of the baby, the baby’s breathing hard, the heart rate’s fast, and the baby looks listless, looks sick. Those three—that description is just a sick baby if I were to describe it. The child was quite ill and this was not recognized in a timely manner and throughout her ... time in the Emergency room, or during her time during hospitalization.
Dr. Crowell opined that Lyric should have been transferred to a facility that provided a higher level of care and expertise. Dr. Crowell further testified that the standard of care for an emergency medicine physician requires that the physician be aware this is a sick baby and the baby has been sick for hours-the physician does not have to diagnose the baby. He emphasized that the child’s vital signs, taken alone, mean nothing. Rather, those numbers taken in conjunction with the whole picture of the child’s presentation, gives the ER physician an idea of a clinical picture.
Dr. Lloyd Gueringer, another member of the MRP, testified on behalf of the plaintiffs as an expert in emergency medicine. He confirmed that the standard of care requires the physician to use skills to make an assessment-does someone really look ill or do they not. He opined that Dr. Jones failed to make that determination. Based on the medical records, Dr. Guer-inger testified Lyric was tachycardic, although technically her numbers were in the high range of normal. He testified Lyric’s breathing was labored and she demonstrated wheezing, indicating she was having | ^difficulties and breathing at some expense. He opined these signs are indicative of a child that is having fairly significant difficulty and it has to be determined why. He emphasized the importance of looking at the overall picture of the child’s presentation, and testified that the fact that Lyric was lethargic was a bad sign; that she was not eating and had no interest in feeding, along with some vomiting, alerts to dehydration. This presentation makes a physician suspect and alarmed that the child is compromised. Dr. Guer-inger further opined that what Dr. Jones did was not what a normal ER physician would have done. That Lyric was lethargic, had an elevated heart rate, elevated respiratory rate, and had no fever, should have given Dr. Jones cause for concern. He testified the normal vitals numbers indicate the child was compensating. Other things such as lethargy, vomiting, elevated heart rate, no fever, not drinking-all together indicated the child was not doing well.
*68 Dr. Bradley Marino, an expert in pediatric cardiology and pediatric intensive critical care .medicine also testified on behalf of the plaintiffs. Dr. Marino wrote the Pediatric Advanced Life Support (“PALS”) guidelines, which provide clear directives on how to handle certain situations and provide national standards of how to resuscitate a pediatric patient. Dr. Marino testified that when a child has decreased urine output, decreased oral intake, has had vomiting, has wheezing, no fever, and a high heart rate of 200, you are concerned either the child is very dehydrated, has a lack of blood in the arteries and veins, or the child has a primary problem with the heart and the pump is not squeezing as well ás it can normally, and as a result the heart rate is compensating by increasing to make sure the child is getting enough blood flow out to the body. He further testified that the fact that Lyric had no fever and a high heart rate “scares” him. He explained that if a child has a fevér the heart rate would necessarily increase, but if-there is no fever it is very concerning and luunless you can prove that the child ■has significant dehydration, the problem has to be thé heart. He testified that based on his- review of the records, Lyric came into the ER in trouble. Dr. Marino testified regarding normal heart rate ranges, explaining that for 6-12 month olds, 108-169 is normal. He further explained that although the PALS guidelines shows normal heart rates by age, and in the stated age category of “3 months to 2 years” the normal rates set forth are 100-190, 190 is not intended for a 6-12 month old. Rather, that high of a rate would be normal for an awake 3-4. month old. He testified it is known-and understood. that the younger the child, the higher the heart rate. He also explained that as a baby ages, respiration rate, like the heart rate, also decreases. Thus, Lyric’s respiration rate of 39 is on the high end of normal despite the PALS reference to 30-60 being the normal range. The stated PALS range would extend over the entire first year of life. Dr. Marino testified that classic findings in infant with heart failure are decreased feeding, vomiting, deceased urine output, tachycardia- with no fever, and often wheezing from cardiac wheezing. His opinion was that Lyric presented in classic fashion; appropriate testing was not done to identify myocarditis; and the child was not.pushed to a higher level of care. Dr. Marino reiterated that the heart rate of 187, given no fever, in conjunction with wheezing, lethargy, not eating, drinking, peeing-all together created a clinical picture of a sick child with a need to be transferred. Dr. Marino opined that if Lyric had been properly .assessed early, when she arrived at the Emergency Room, and then transferred to a higher level care facility, she would have had a 75-85% chance of survival.
Dr. Joseph Litner testified as an expert in emergency medicine on behalf of Dr. Jones. It was his opinion that Dr. Jones complied with the standard of care. Dr. Litner testified that Dr. Jones’ diagnoses of asthma and possible pneumonia were reasonable 115based on the clinical presentation and x-ray. He stated that myocardi-tis would not be on a doctor’s list of differential diagnoses based on the presentation. According to Dr. Litner, once Dr. Jones reached a respiratory diagnosis, it was her duty as an ER physician to treat that condition. Dr. Litner testified that Lyric’s physical exam did not reveal anything out of the ordinary. Nebulization treatments with Xopenex, steroids, and' antibiotics were appropriate treatments in his opinion. Additionally, Dr. Jones’ decision to admit Lyric was appropriate and prudent. Dr. Litner- testified that based on his review of the records and materials, his opinion was that Dr. Jones adequately as *69 sessed and adequately recognized the situation as Lyric presented to the hospital. Dr. Litner further testified that once Lyric was moved to the floor, there was almost a four hour period where there was no acute distress and it was not until about 2:00 a.m. that Lyric started to deteriorate. According to Dr. Litner, Lyric’s vital signs were normal until about 2:48 a.m. He stated the records do not indicate respiratory distress. Dr. Litner disagreed with the MRP that Lyric presented tachycardic and tachypneic and disagreed that Lyric presented as “quite ill.” However, Dr. Litner acknowledged his prior deposition testimony wherein he testified a heart rate of 200 was slightly tachycardic, but then attempted to reduce the significance of this statement by associating the 200 heart rate with the administration of Xopenex. Dr. Litner also agreed on cross examination that Lyric presented to the ER as lethargic and he acknowledged that Dr. Jones’ evaluation of Lyric noted she was lethargic. He further disagreed that Lyric was “rapidly decompensating,” stating she was not decompensating until after 2:00 a.m. He testified there was no indication Lyric should have been transferred-she had normal vital signs and there was no obvious reason she could not be managed in a community hospital. Dr. Litner agreed on cross-examination that the job of an ER physician is to stabilize, treat and refer.
11fiDr. John Breinholt testified as an expert in pediatrics and pediatric cardiology on behalf of Dr, Jones. Based on his review of the records, he testified Lyric presented to the ER with some reactive airway disease, like bronchiolitis. The picture presented in the records is not a picture of a child with a problem of cardiac origin, but rather a child with a respiratory problem of some sort. Dr. Breinholt testified that from admission to 2:00 a.m., there was not much change in baby’s condition; no evidence of a worsening condition or failure to respond to therapy. He did not see an indication for transfer during the ER stay or after admission. However, Dr. Bre-inholt agreed that Lyric presented tachy-cardic with rates in the 180s and that her heart rate remained elevated throughout her admission. Further, he stated that based on the mother’s description that the child was breathing faster than normal, he would not dispute there was mild to moderate respiratory distress. He also agreed Lyric had some form of dehydration upon admission to the ER, although only mildly dehydrated. Although Dr. Breinholt testified that the mortality, rate of infants with acute fulminant myocarditis can be as high as 75%, he also agreed that for children with acute fulminant myocarditis, “one third will die, one third will survive and do just fine, and then the other third, they’ll require medical therapy.”
Defendant, Dr. Rhoda Jones, testified regarding her treatment of Lyric. Upon examining Lyric, she testified the child acted appropriately, and described the child as tired. She found no signs of dehydration, no heart murmurs, but she did hear wheezing. She ordered blood tests and a chest x-ray to make sure Lyric did not have pneumonia. She ordered a CBC to check for infection or anemia and a CMP to measure electrolytes, renal function. The chest x-ray was essentially normal and the CBC was normal. According to Dr. Jones, the CMP was not performed and was cancelled by the lab personnel because the machine was not working. She alsojjjordered a test for RSV, which came back negative. She testified that based on the information she had (labs, x-ray, patient exam) - she thought Lyric had asthma exacerbation and admitted her to the hospital for nebulizer treatments and observation overnight. Dr. Jones found all of Lyric’s vital signs were in the normal range for a seven month old. She ordered a *70 steroid and an antibiotic in addition to the nebulizer treatments. She did not order IV fluids for the baby because she stated Lyric was drinking Pedialyte. Dr. Jones testified she was advised about 2:00 a.m. that the baby was not doing well. When she walked into the room, the baby was crying and a nurse was trying to insert an IV in the baby. She told the nurse to stop and that she would place an 10 (intraosseous) line through the bone. Dr. Jones testified she had ordered an IV when she did the admission orders because this would be more comfortable for the baby than continuing IM (intramuscular) shots and she assumed the nurses had done the IV; she had not received a report of an unsuccessful IV She picked up Lyric to try to console her before she did the 10; Lyric stiffened and starting having seizure activity; she laid Lyric down, called for the crash cart and started running the code (i.e., resuscitate the baby).
Dr. Jones testified that when Lyric was in the ER, she saw no basis to justify transferring her to another facility because the baby was in no apparent distress. Dr. Jones admits she did not order any additional lab tests or do another work up on Lyric. She admitted Lyric to the hospital for observation under her care. No orders were written to evaluate Lyric later in the evening or the next day. She testified she did not think it was necessary to write orders ,to follow up or evaluate the baby the next day.
However, relative to her assessment and treatment of Lyric, Dr. Jones’ testimony conflicted with the medical records numerous times, calling her credibility |18into question. For example, Dr. Jones admitted she assessed Lyric as “lethargic” but tried to minimize that finding by testifying what she meant when she wrote lethargic: “she—the baby was tired, like it was just kind of tired. I mean she just kind of tired, but she was a little playful a little bit but she was kind of tired. I don’t know if she had been out all day and—you know because a lot of times when kids are up all day they’re tired in the evening because they haven’t gotten their naps.” Dr. Jones testified the standard of care required that she do a work up on Lyric consisting of a chest x-ray, a CBC and a CMP, which was not done. Dr. Jones testified she ordered the CMP and the CMP test was pending because the hospital was having problems with the machine, yet the medical records indicate the test was cancelled. Dr. Jones claimed that although she wrote the order for the CMP, and she was the only physician on duty that night, she did not cancel it and it must have been cancelled by the lab department without notifying her. Further, although Lyric’s medical records indicate Dr. Jones only examined Lyric one time, Dr. Jones claimed she did not write in the chart every time she saw or assessed Lyric. Dr. Jones testified the nurses told her they attempted to start an IV on Lyric multiple times, yet only one attempt is noted in the chart. Dr. Jones claimed the nurses failed to chart the other attempts. Dr. Jones admitted she did not write an order to check Lyric’s vital signs once she was admitted, but tried to justify the omission by explaining the respiratory therapists would routinely check the vitals because Lyric had a nebulizer treatment. When questioned why there were no such notations in the chart by the respiratory therapists, Dr. Jones claimed the vital signs were taken but not documented and she was verbally advised of Lyric’s vitals. Dr. Jones denied the baby had vomiting in the hospital, but admitted Phenergan was given to the baby at 8:10 p.m. She denied giving the order for Phen-ergan and claims it was given by a nurse without her order, but the record ^indicates a verbal order by Dr. Jones for Phenergan. Moreover, the medical records *71 indicate two episodes of Lyric vomiting/spitting up after she was admitted. Dr. Jones admitted she did not order IV fluids for Lyric, explaining that the baby was taking pedialyte in the ER and would suck on a Pedialyte bottle throughout her time at the hospital. However, the hospital records indicate Lyric had zero liquid intake during her hospitalization. Notably, Dr. Jones also denied the triage nurse asked her about transferring Lyric, although the nurse’s concern is documented in the medical records.
It is undisputed that the standard of care simply required Dr. Jones to recognize Lyric presented to the emergency room as a sick baby and to transfer her to a higher level care facility. As confirmed by the unanimous opinion of the MRP and the testimony of Drs. Crowell, Gueringer, and Marino, the medical records undoubtedly support a finding that Lyric presented to the ER “quite ill.” Lyric was documented as lethargic, wheezing, with a history of vomiting and rapid breathing, and a heart rate of 189. Although Drs. Litner and Breinholt opined Dr. Jones did not breach the standard of care, they also gave some testimony supporting a finding that Lyric presented to the ER very ill. Further, Dr. Jones’ overall testimony was self-serving and often inconsistent with the medical records.
Moreover, a finding that Lyric presented to the ER “quite ill” is also supported by the entry in the medical records from the triage nurse that she asked Dr. Jones at least three times if they could call another facility to take the baby. Although Dr. Jones attempts to discount the significance of this note by pointing out it was a late entry and the nurse was not called to testify, we find these facts to be of no consequence. There is no evidence in the record to suggest late entries in medical records are disallowed or unusual. Further, other than Dr. Jones’ own biased testimony denying the event occurred, there is nothing in the record to support a |anflnding that this entry was false or invalid. The medical experts who testified regarding this nurse’s note found it to be highly material relative to Lyric’s condition. Dr. Crowell specifically testified regarding this entry in Lyric’s medical records:
Q: (Plaintiffs’ counsel): Now based on this annotation from the nurse in the medical records, what does that say to you?
A: (Dr. Crowell): Again, having done this for 40 years nurses making comments to me about what’s going on is very important to me. And if a nurse comes to me and repeatedly asked me “can’t we send this baby somewhere else,” that means something to me. And that meant something to me when I read this record when we reviewed the record.
It meant something to all three of us and that—the nurses are just uncomfortable keeping this baby in this hospital, they’re uncomfortable continuing to try to manage the baby. There’s absolutely no validity that I can—that I know of for the comment that no one will take this baby without labs and having no fever.
If I call Children’s Hospital in New Orleans with a sick baby, they send—they will come get that baby. I don’t have to have labs, I don’t have to have any tests, I don’t have to have anything. I just need to say I’ve got a sick baby that I can’t handle, come get him, and they will come get him or make an effort to come get him.
I don’t have to prove my ease to justify calling for help. And that was a big issue for us in the Emergency Room. As ER *72 doctors, our job is not to know what’s going on in detail, we don’t have to make the diagnosis. We just have to know that this is a sick person and I need to get them where they need to be to have the best chance of doing well. And that nurse is saying, please can’t we send this baby somewhere else. That’s what I got out of the record. And this was not acted upon and that meant a lot to us when we reviewed this case.
Similarly, Dr. Marino testified:
Q (Plaintiffs’ counsel): ... One thing I wanted to ask you about the admit sheet...is where the nurse documents that she’s asked Dr. Jones at least three times if she could transfer this baby. Does that have any significance for you?
A (Dr. Marino): It has a very, very, very high significance for me. ... In having worked in an ICU now for almost 20 years, when a nurse comes up to me and says, I’ve got specific concerns about a patient, I take that very seriously. Because usually that means that a patient’s status has changed. Well, my nurse many of whom have lots of years of critical experience like I do, is seeing something that’s making them very concerned.
121So for a nurse, on three different occasions, in my opinion, to go to Dr. Jones and say, I think we should transfer this child elsewhere; her sixth sense was kicking in saying there’s something wrong with this child and it’s not just asthma, it’s not just bronchiolitis, it’s something much more significant.
Nurses typically, because of the authority gradient between physicians and nurses, they don’t like to do that. It’s not their nature to go against the physician. Typically they’ll do what the physician says to do. So for this nurse, on three different occasions, to go to this doctor and say, I think this child should be transferred, it says a lot.
And typically, at least in my ICU and I’m sure emergency department’s ICUs work very similarly, when I go and reevaluate that patient, when my nurses come to me and say I have concerns, nine times out of ten, they’re right.
Dr. Gueringer agreed, testifying:
Q (Plaintiffs’ counsel): Now, Dr. Gueringer, the triage medical records indicates that nurse Gilman who was taking care of the baby in the Emergency Room asked Dr. Jones at least three times, “Can we transfer this baby.” Does that signify anything to you?
A (Dr. Gueringer): It would suggest to me that the nurses, one, recognized that the child was sick; and two, that they may very well have not been capable of handling the child at that facility.
Additionally, although it was undisputed that the standard of care did not require Dr. Jones to diagnose myocarditis, the experts and Dr. Jones gave substantial testimony regarding myocarditis and its presentation and diagnosis. Given such testimony, we find the record supports the district court’s reasoning that the jury was confused as to the standard of care.
Considering the entirety of the evidence and testimony presented at trial and given the district court’s ability to evaluate the evidence and evaluate witness credibility in ruling on a motion for new trial under Article 1972(1), and the district court’s much discretion in granting a new trial pursuant to Article 1973, we find no abuse of the district court’s discretion in granting a new trial.
CONCLUSION
12?For the above reasons, we affirm the ruling of the court of appeal setting aside the district court’s grant of the JNOV. *73 However, we reverse the ruling of the court of appeal relative to the new trial and we reinstate the district court’s grant of the plaintiffs’ motion for new trial.
DECREE
AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.
WEIMER, Justice, concurs in part and dissents in part and assigns reasons.
GUIDRY, Justice, concurs and assigns reasons.
CLARK, Justice, concurs in part and dissents in part for the reasons assigned by Justice Weimer.
CRICHTON, Justice, additionally concurs for the reasons assigned by Justice Guidry.

. According to Ms. Gurley's testimony, the period of time was 2 hours, rather than 12 hours.

. According to trial testimony, an infiltrate could.be anything; possibly a pneumonia.

. Plaintiffs also asserted Dr. Jones failed to rescue Lyric by failing to properly run the code and properly resuscitate Lyric once she went into cardiac failure. Because we find no abuse of discretion in the district court’s ruling based on the standard of care relative to transferring a patient, we need not address the issue of Dr. Jones’ alleged negligence relative to her attempted resuscitation of Lyric.