| JODY ALAN GOLDSTEIN | * | NO. 2020-CA-0401 |
|---|---|---|
| VERSUS | * | COURT OF APPEAL |
| CHATEAU ORLEANS, INC., LEISURE MANAGEMENT, LTD., AND XYZ INSURANCE COMPANY | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * | |
| | * | |

* * * * * * *

**DYSART, J., DISSENTS WITH REASONS**

I respectfully dissent from the majority opinion in this matter and would affirm the judgment of the trial court.

The record of this case, in my view, clearly demonstrates that the attack on Mr. Goldstein in his timeshare unit within the Chateau Orleans was an isolated incident. The record likewise reflects a complete absence of similar events near the Chateau Orleans within three years or (or any time before or after) its occurrence. Indeed, neither Mr. Goldstein's nor Leisure Management's experts identified a single incident similar to the attack within the three years prior to its occurrence.[1] Thus, in my opinion, the trial court properly concluded that the attack was not foreseeable and properly granted Leisure Management's judgment notwithstanding the verdict (JNOV).

A JNOV is a procedural device "by which the trial court may modify [a] jury's findings to correct an erroneous jury verdict." *Pitts v. Louisiana Med. Mut. Ins. Co.*, 16-1232, p. 7 (La. 3/15/17), 218 So.3d 58, 64. A JNOV "is warranted when the facts when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict." *Harts v. Downing*, 19-0620, pp. 3-4 (La. App. 4 Cir.

---

[1] Nor were any similar incidents identified at *any* time, both before the 2005 attack or since then.

6/24/20), 302 So.3d 102, 108 (citing *Davis v. Wal-Mart Stores, Inc.*, 00-0445, p. 4 (La. 11/28/00), 774 So.2d 84, 89). The Louisiana Supreme Court has indicated that an appellate court must initially determine whether the trial court erred in granting a JNOV, by evaluating the same criteria used by the trial court in determining whether to grant the motion. *VaSalle v. Wal-Mart Stores, Inc.,* 01-0462, pp. 11-12 (La. 11/28/01), 801 So.2d 331, 339. "That is, the court must determine whether the 'facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict.'" *Id.*, p. 12, 801 So.2d at 339. (Citation omitted). "If reasonable persons might reach a different conclusion, then the trial judge erred in granting the motion and the jury verdict should be reinstated." *Id.*

The standard of review of a JNOV is two-fold. After an appellate court has determined that the trial court correctly applied its standard of review in evaluating the jury's verdict, the appellate court is to review the JNOV under a manifest error standard of review. *Davis*, p. 5, 774 So.2d at 89.

The trial court's Reasons for Judgment cited the Louisiana Supreme Court case of *Posecai v. Wal-Mart Stores, Inc.*, 752 So.2d 762, 766 (La. 11/30/99) and concluded that, "[b]ased on the testimony, evidence, and law . . . , this court finds that reasonable men could not reach different conclusions other than to find that this crime was not foreseeable; and, therefore, there is no basis to impose a duty on defendant, Leisure Management, Ltd. to protect plaintiff, Mr. Goldstein from the criminal acts of third parties." In my opinion, the trial court's conclusions are correct that, under Louisiana law, Leisure Management neither owed, nor breached, a duty to Mr. Goldstein. Because reasonable men could not reach a different conclusion, I would find no manifest error in the trial court's grant of a JNOV in Leisure Management's favor.

Although, again, I do not believe that the manner by which the Chateau Orleans is classified is dispositive of its duty in light of our jurisprudence regarding foreseeability, I first address that issue. The majority concludes that the Chateau Orleans is "a multi-purpose property containing timeshares, hotel rooms, and condominiums" and that "the timeshare units were also utilized as hotel rooms if the timeshare owners were not in occupancy." In my view of the record, there is nothing indicating that the units Chateau Orleans were used as condos or hotel rooms. The only testimony in this regard came from Mr. Goldstein who testified that, when he wanted to stay at the Chateau Orleans at a time other than the designated time of his timeshare interest, he "would call the desk and tell them that [he] was coming down, and [he] would book a room like [he] would book any hotel room;" he would "[m]ake a reservation."

At trial, counsel for Mr. Goldstein repeatedly referred to the facility as a "condo hotel," because at his deposition, Paul Collins, the general manager of the facility, referred to it as such. Mr. Collins' testimony at trial was clear; he expressly stated that "[i]t's a timeshare condo. It's not a hotel." Mr. Collins expounded on the nature of the facility in his deposition, proffered at trial, indicating that the Chateau Orleans is owned by the individual owners of each timeshare and unit; ownership is "divided into 52 weeks." The fact that the Chateau Orleans Owners Association contracted with Leisure Management to provide management services to it does not convert the facility into a hotel.[2]

Mr. Collins' testimony that the facility is not a hotel but rather timeshare condominium is corroborated by the corporate documents creating the Chateau Orleans, offered into evidence at trial. "The Condominium Declaration Creating and Establishing Chateau Orleans[;] A Condominium," recites its purpose: to

---

[2] The owners of the various units together own certain common grounds and have different voting privileges and rights, as well as ownership percentages. The ownership interests are titled in each owners' name.

provide "ownership of each of the condominium units as separate parcels of real or immovable property and for common undivided ownership by Unit Owners of . . . Common elements." It further recites that "all of the residential condominium units created hereby [are] to be submitted to an 'interval ownership' or 'timeshare' arrangement or agreement whereby co-owners of any unit may designate periods of time during which each co-owner shall have the exclusive use and possession of such unit."

A "unit" is defined as "[t]hose parts of the Condominium Property which are situated entirely within the Building and which are intended for independent use and occupancy as residences and are subject to individual ownership." A "Unit Owner or Co-Owner" is defined as "[t]he record owner or the owners in indivision of a Unit . . . ." A "Timeshare Unit or Unit Committed to Timesharing" is "[a]ny Unit intended for residential use owned by two or more Unit Co-Owners who have agreed in the acquisition of said Unit that the beneficial use and enjoyment thereof shall be exercised jointly by all c-owners on an 'interval ownership' or 'time-share' basis of 52 Unit weeks, whereby each Unit Co-Owner is entitled to a Unit Week occupancy for each 1/52 or 1.923 percent of undivided ownership interest in the Unit."

It is clear that a timeshare is not the same as a hotel as s recognized by the Comprehensive Zoning Ordinance of the City of New Orleans ("CZO"). Article 26.6 defines a timeshare building as "[a] building containing condominium units, rooms or suites of rooms, with or without culinary facilities and subject to a timeshare plan." A "[t]imeshare [p]lan" is then defined as:

> Any plan or program in which the use, occupancy, or possession of one (1) or more condominium units, rooms, or suites of rooms in a timeshare building circulates among various unrelated persons for a specific or discernible period by temporal division of less than a sixty (60) day period in any year for any occupant.

Timeshare plans include timeshare ownership plans and timeshare use plans, as follows:

A. Timeshare ownership plan is any arrangement, whether through common ownership, sale or by other means, whereby a person receives an ownership interest in a condominium unit, room, or suite of rooms in a timeshare building.

B. Timeshare use plan is any arrangement, **excluding normal hotel operations**, whether by membership agreement, lease, rental agreement, license, use agreement, security, or other means, whereby a person receives the right to use but not an ownership interest in a condominium unit, room, or suite of rooms in a timeshare building.

(Emphasis added).

The CZO differentiates a timeshare and a hotel/motel and defines the latter as "[a]n establishment providing a room for sleeping accommodations for a fee with private bathroom facilities and customary lodging services. Related ancillary uses may include, but are not limited to conference and meeting rooms, restaurants, sale of convenience items, bars, and recreational facilities."

Thus, the majority's conflation of the Chateau Orleans' character as a timeshare with a hotel is, in my opinion, not supported by the record. Nor, in my view, is the Chateau Orleans an "inn," by which it would owe a higher degree of care to its residents and would have "a duty to take reasonable precautions against criminals" as set forth in *Kraaz v. La Quinta Motor Inns, Inc.*, 410 So.2d 1048, 1053 (La. 1982), and its progeny.

While our jurisprudence recognizes the higher degree of care owed by an inn, it likewise recognizes that the "duty does not extend to unforeseeable or unanticipated criminal acts by independent third persons." *Espinosa v. Accor N. Am., Inc.*, 14-1276, p. 8 (La. App. 4 Cir. 7/8/15), 174 So.3d 123, 129. That the true issue in all of these cases is the *foreseeability* of a criminal act is illustrated by this Court's decision of *Landry v. St. Charles Inn, Inc.*, 446 So.2d 1246 (La. App. 4

Cir. 1984), a case on which Mr. Goldstein relies, and which imposed liability on a hotel for the attack of one of its guests in its parking lot. In doing so, the Court focused on the complete lack of security provided by the hotel in light of a significant history of crime near the hotel; namely, "no less than seven robberies or assaults . . . [that] occurred in the immediate area during the year preceding this incident." *Id*. at p. 1249. Most importantly, "there were no security precautions of any kind whatsoever." *Id*. *See also*, *Franklin v. Paul Dupuis & Assocs*., 543 So.2d 970, 972 (La. App. 3 Cir. 1986)(judgment affirmed in favor of hotel, finding no breach of an innkeeper's duty, where plaintiff, who was robbed and shot in the parking lot of a motel, failed to prove that the "motel's management and owner were aware of the risk but did not take reasonable precautions" given that there had only been two armed robberies of the motel's office, the last of which occurred several years before the incident).

In the instant matter, unlike *Landry* and *Franklin*, there was no evidence of any crimes against persons or crimes remotely similar to that perpetrated against Mr. Goldstein in the three years prior to the attack (or at any other time).[3] Moreover, unlike *Landry*, where there was a complete absence of security measures, the Chateau Orleans had security measures in place. The two doors allowing entrance into the facility are always locked and entry can be gained in one of two ways. First, there is a security camera that allows the Leisure Management employees on duty at the front desk to see people who ring the doorbell and permit their entrance into the building. Second, there are keypads at each of the doors and entry can be made by entering the correct code into the keypad. The code is

---

[3] Indeed, the experts for Mr. Goldstein and for the Chateau Orleans did not identify a single incident remotely similar to the attack on Mr. Goldstein, either in the facility or in the area sound it at any time. Mr. Goldstein's expert, Michael. Khairallah was questioned specifically about "the type of crime that happened to Mr. Goldstein in this case," and if "there [was] anything similar about that crime to the crimes that [he] observed in [his] analysis of the 200 block of Burgundy for the three previous years." Mr. Khairallah's response was simply his opinion that the crime against Mr. Goldstein was a "crime of opportunity."

changed weekly, in keeping with the facility's weekly turnover of residents. The facility also has a courtyard with a pool that is enclosed by a concrete wall and a wrought-iron gate that is always closed and locked. There are also metal spikes on top of the concrete wall and gate, providing security for the courtyard, as well as glass embedded in the wall, also providing further security.[4]

These security measures are, in my opinion, sufficient for the Chateau Orleans, given the lack of any violent crime or crimes against the person within the timeshare facility, or around it.

Turning to the central issue in this case – the foreseeability of the attack on Mr. Goldstein – the seminal case is *Posecai*, the case on which the trial court relied. *Posecai* established the general rule that, while business owners have a duty to implement reasonable safety measures for the protection of their patrons, "there is generally no duty to protect others from the criminal activities of third persons." *Posecai*, p. 5, 752 So.2d at 766. The Court further expounded that the duty to protect against foreseeable criminal acts "arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business." *Id*., pp. 5-6, 722 So.2d at 766. The foreseeability of the criminal act "is to be determined by the facts and circumstances of the case." *Id*, p. 9, 752 So.2d at 768.

The *Posecai* Court determined that the robbery of a patron in the parking lot of a Sam's Club was not reasonably foreseeable, despite the fact that there were three predatory offenses (offenses against the person) in the six years preceding the robbery at issue. Notably, there had been eighty-three predatory offense at the thirteen businesses on the same block of Sam's. The Court noted that, "[a]lthough the neighborhood bordering Sam's is considered a high crime area by local law

---

[4] The parties agree that the Vieux Carre Commission restricts what owners of buildings in the French Quarter may do to the buildings.

enforcement," "the foreseeability and gravity of harm in Sam's parking lot remained slight." *Id.* The Court focused on the fact that there had only been the one previous robbery of a customer over a number of years, despite the "large number of customers that used Sam's parking lot," which "indicate[d] a very low crime risk." *Id.*, p. 9, 752 So.2d at 768-69.

The Supreme Court, in the later decision of *Pinsonneault v. Merchants & Farmers Bank & Tr. Co.*, 01-2217 (La. 4/3/02), 816 So.2d 270, 277, clarified that under *Posecai*, "while the existence, frequency, and similarity of prior incidents of crime on the premises is an important consideration in the duty determination, other factors, such as the location, nature, and condition of the property should also be taken into account." *Pinsonneault* involved a lawsuit by the parents of a man who had been making a night deposit at a bank and who was shot and killed by two escapees from a jail filed suit against the bank. The plaintiffs alleged that the bank had been negligent in providing security for after-hours banking. The trial court ruled in favor of the bank, on the basis that, while the bank owed a duty, it did not breach that duty. The Third Circuit reversed, finding that the bank was negligent in its security measures; namely, a lack of security cameras at the night deposit, the bank's failure to trim bushes, the banks' failure to extend the fence to enclose three sides of the property, and its failure to improve lighting.

In reinstating the trial court's judgment, the Supreme Court considered the evidence of prior crime at the bank, which was limited to two prior armed robberies inside the bank (but not of patrons) during business hours in the previous fourteen years. There had been no prior crimes with respect to the night deposits. The Court held as follows:

> Given the absolute absence of this type of crime in Vernon Parish and the absence of significant crime in the area near the bank, there is no basis for determining an attack at the night deposit was sufficiently foreseeable such that the bank was obligated to upgrade security.

> Lighting was adequate and fencing was in place. In our application of the *Posecai* balancing test, we find the decision of the trial court was reasonable in its determination the Bank did not breach its duty regarding security.

*Id*., p. 18, 816 So.2d at 282-83.[5]

The *Pinsonneault* Court commented, that "[w]hile there is certainly room for debate in every case as to what security measures are reasonable, the determination is essentially a factual one, requiring a careful balancing of factors that is best conducted at the trial court level, where the gravity of harm and costs of remediation can be analyzed and weighed." *Id*., p. 13, 816 So.2d at 279. "It is not the role of the appellate court to second guess the trier of fact's determination in this regard, but to review that determination for clear error." *Id*.

Our jurisprudence makes clear that under *Posecai*, as clarified by *Pinsonneault*, courts are to consider the totality of the circumstances when addressing the liability of a premises owner for the crimes committed by third parties. I agree with the majority that, in *Dearmon v. St. Ann Lodging, L.L.C.*, 18-0994 (La. App. 4 Cir. 3/27/19), 267 So.3d 639, this Court reiterated that the location, nature and condition of the property should be taken into account on the issue of foreseeability. Indeed, the *Pinsonneault* Court specifically made this statement. I do not, however, agree with the majority that the Court in *Dearmon* made an express finding that "the crime was foreseeable based on the circumstances immediately preceding the attack." While the plaintiffs' expert in *Dearmon* opined that "the risk of crime and the potential for violent and non-violent criminal activity was reasonably foreseeable,"[6] this Court made no such finding. The Court merely found that there were genuine issues of material fact as to the extent of the duty owed to the plaintiffs, which precluded summary

---

[5] The Court likewise commented that "no one suggested security guards were necessary for the bank to fulfill its security obligation." *Id*, p. 18, 816 So.2d at 282.

[6] *Id*., pp. 5-6, 267 So.3d at 643

judgment. In so finding, the Court noted that the defense did not offer any evidence to rebut the plaintiffs' expert opinions.

I would note, too, that although the hotel's expert in *Dearmon* attested in his affidavit that he had no knowledge about incidents involving alleged criminal activity at the hotel or the area immediately surrounding it, there were other factors involved in the expert's determination that the hotel breached a duty to the plaintiffs, who were beaten and robbed after opening their hotel room door to individuals who identified themselves as police officers.[7] A hotel report of the incident indicated that an employee of the hotel noticed several "shady men" walk by the front desk to the elevators, who were also seen by the hotel's security. When a disturbance was reported on the fifth floor of the hotel, security went to the site, "heard a commotion" and "[a]t that time, security chose to disengage and call the police." *Id.*, p. 5, 267 So.3d at 643. It was "[t]hat evidence, together with the [hotel's] central location in the French Quarter"[8] which formed the expert's opinion.

*Dearmon* does not establish any rule regarding the foreseeability of criminal activity, nor any affirmative finding that the location of a hotel in the French Quarter, alone, suffices to establish the foreseeability of crime. In my view, it simply establishes that the issue of the foreseeability of crime is not one to be resolved on summary judgment, where fact issues predominate.

Furthermore, in my view, the majority's reliance on *Chatman v. S. Univ. at New Orleans*, 15-1179 (La. App. 4 Cir. 7/6/16), 197 So.3d 366 as support for its finding of liability on Chateau Orleans' part is misplaced. The plaintiff in *Chatman* had been attacked and badly injured in her on-campus apartment by her

---

[7] The Court also cited *Salafian v. Gabriel*, 2013-1399, p. 6 (La. App. 4 Cir. 7/16/14), 146 So.3d 753, 757 for the principle that "in Louisiana, an 'innkeeper has a duty to take reasonable precautions against criminals.'" As I noted herein, in my opinion, the innkeeper's duty does not extend to timeshare facilities.

[8] *Id.*, p. 5, 267 So.3d at 643.

roommate and her roommate's sixteen-year old cousin. The issue in *Chapman* was whether the university's duty to protect its students encompassed he attack on the plaintiff. In concluding that the university breached a duty to this particular plaintiff under the circumstances presented, it is clear that the Court's finding was based on the university's failure to enforce and adhere to its own housing rules, including the following. In the days leading up to the attack, non-students were coming in and out of the apartment, including the room-mates minor cousin, who was staying overnight, a clear breach of the university's housing rules. There were other incidents at that time about which the plaintiff complained to a resident "community assistant" ("CA").[9] Importantly, contrary to the university's rules, the plaintiff had never been provided with the name and telephone number of the CA for her building (the CA to whom she had complained was someone she happened to meet when she moved into her apartment).

The *Chatman* Court recognized that, as a general rule, "[u]niversities have a duty to provide a safe campus and to act with a reasonable regard for the students' safety." *Id*, p. 18, 197 So.3d 378. However, with respect to the duty to protect students from the criminal acts of third parties, "those criminal acts must be foreseeable." *Id*.

The Court ultimately found the university to be 15% at fault for the incident based upon the following:

> It is clear, therefore, that the CAs' availability to the
> resident students, and the CAs' obligation to "vigilantly"
> enforce SUNO's written policies strictly limiting visits
> by non-residents and minors, were a crucial part of
> SUNO's plan to ensure the safety and security of its
> students living in on-campus housing. As discussed
> above, the evidence makes clear that SUNO failed to
> ensure that the CAs were always available to help SUNO
> students with safety and security problems. Although the
> CA who lived in Ms. Chatman's building knew that he
> was responsible for enforcing SUNO's written housing

---

[9] The university assigned CAs to each of its ten buildings that housed students.

policies, he never inspected the building to make certain that no unauthorized visitors were staying in any of the apartments. Plainly, SUNO also was unreasonably lax in the enforcement of its written policies, which were intended to protect its students from risks of harm posed by unauthorized persons present in the apartments.

*  *  *

Ms. Chatman suffered a brutal criminal attack by the precise sort of person—a non-student, non-resident minor—whose SUNO's rules and policies were intended to bar from campus housing without prior authorization. SUNO's policies that guarantee its students 24–hour access to housing staff, who are responsible for enforcing SUNO's safety and visitation rules, were intended to prevent the risk of criminal behavior by such persons. We conclude that the risk of a vicious physical attack on Ms. Chatman by a non-student minor who was not authorized to be present in the apartment is easily associated with SUNO's duty to ensure the safety of its students who live in SUNO's on-campus housing.

*Id.*, pp. 21-22, 197 So.3d at 380-81.

Thus, like all of the cases addressing liability for the criminal acts of others, *Chatman* was based on the particular facts and circumstances presented. While the majority focuses on the fact that "no similar crime had previously occurred on the premises" in *Chatman*,[10] this was not the only factor upon which the university's 15% fault was based.

In the instant matter, the record is devoid of any evidence of crime against persons at any time in the Chateau Orleans or in the vicinity around it. Nor are there any other circumstances which would otherwise render the attack on Mr. Goldstein foreseeable. The only basis for finding that the attack was foreseeable would be the location of the facility in the French Quarter. This, in my opinion, is not the intent nor the implication of either *Posecai* or *Pinsonneault*. The majority's conclusion that the foreseeability of the attack on Mr. Goldstein was

---

[10] The majority also points out that, in *Dearmon*, there was no history of prior criminal acts. Again, the *Dearmon* Court made no finding that the attack on the plaintiffs had been foreseeable. While the Court the opinions of the plaintiffs' expert on foreseeability, it ultimately only found that there were issues of fact for which summary judgment was inappropriate.

based on the locality of the Chateau Orleans in the French Quarter would have the effect of rendering virtually *all* crime in the French Quarter foreseeable.

I further disagree with the majority that the facts of this case are analogous to *Chatman* with respect to a security issues presented by the crack in the door to Mr. Goldstein's unit, which he testified he report to the Chateau Orleans and the latter's failure to repair it. Nor do I agree with the majority that a "secure door would have been a strong deterrent.

The only testimony in the record which suggests that the crack in the door played a role in the attack came from Mr. Goldstein's expert. Mr. Khairallah testified that, in his opinion, the crack in the door "would be attractive to criminals" and that the "condition of the door was a substantial factor in the burglary" because the crack made the door "easily breached." This testimony is as to the motives of the assailants in breaking into Mr. Goldstein's unit is purely speculative; the assailants were never identified or arrested. More importantly, the record testimony clearly established that the door was breached by being pushed in, as the only damage to the door was to its lock. That is, the door did not break at the site of the crack and allow entry. The record, thus, does not support a finding that the condition of the door in any way contributed to the attack on Mr. Goldstein.

I would also note that Mr. Goldstein's argument that the crack in the door made his unit unsafe under La. C.C. art. 2317.1 is without merit.

Article 2317.1 provides, in pertinent part, as follows:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

This Court recently reiterated the well-settled jurisprudence that, in order to establish a premises liability claim under this Article, an injured plaintiff must show that: "(1) the thing was in the custodian's custody or control; (2) it had a vice or defect that presented an unreasonable risk of harm; (3) the defendant knew or should have known of the unreasonable risk of harm; and (4) the damage was caused by the defect." *Cipolla v. Cox Commc's Louisiana, LLC*, 19-0509, p. 9 (La. App. 4 Cir. 8/5/20), 305 So.3d 911, 917, *writ denied*, 20-01123 (La. 11/10/20), 303 So.3d 1035. It is equally well-settled that "not every minor imperfection or irregularity will give rise to strict liability [under Article 2317.1]; the defect must be of such a nature as to constitute a dangerous condition, which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances." *McCloud v. Hous. Auth. of New Orleans*, 08-0094, p. 4 (La. App. 4 Cir. 6/11/08), 987 So.2d 360, 363.

More importantly for purposes of liability under Article 2317.1, it is the defective condition, itself, that must be the cause of the injury. *See*, *e.g.*, *Maddox v. Howard Hughes Corp.*, 19-0135, p. 6 (La. App. 4 Cir. 4/17/19), 268 So.3d 333, 338 ("[t]he existence of a defect may not be inferred solely from the fact that an accident occurred; rather, a plaintiff is required to prove, by a preponderance of the evidence, the existence of a defect *and that the defect caused the plaintiff's damages*.")(Emphasis added).

Mr. Goldstein asserts that the crack in the door was an "obvious defect," that Chateau Orleans failed to address. The "breach of this duty," he contends, was "a direct cause of [his] physical, emotional and financial damages." Even if we were to accept that the crack in the door was a "defect," there is no showing that this defect was the cause of Mr. Goldstein's injuries or damages. If, for example, the door had fallen on Mr. Goldstein, this would be the sort of "defect" that could

render Leisure Management liable for damages (assuming the other elements of a claim under Article 2317.1 are also met).

An analogous argument that an alleged premises defect led to a plaintiff's injuries was made and rejected by this Court in *Espinosa v. Accor N. Am., Inc.,* 2014-1276 (La. App. 4 Cir. 7/8/15), 174 So.3d 123.[11] In that case, the plaintiff was shot in the parking lot of a motel at which he had been staying for two weeks. In his suit against the motel and its local franchisee, the plaintiff alleged that a broken gate, about which management was aware, allowed the armed robbers entry to the parking lot. The Court, noting that there were several ways by which the armed robber could have accessed the property, found that the plaintiff "suffered harm from the acts of an intervening third party who chose to enter the [m]otel parking lot for criminal activity." *Id.*, p. 7, 174 So.3d at 128. It then found that the "plaintiff failed to present evidence sufficient to establish that the missing section of fence created an unreasonably dangerous condition such that a duty was created and imposed upon [the defendant]." *Id.*

As this Court did in *Espinosa*, I would find that there is insufficient evidence in the record to support the conclusion that the crack in the door presented an unreasonably dangerous condition for which a duty arose to protect against the criminal acts of third parties.

Based on the foregoing, in my view of the record and the case law on the issue of the Chateau Orleans' liability to Mr. Goldstein, there is no basis for determining that the attack on Mr. Goldstein was sufficiently foreseeable such that Leisure Management is liable for insufficient security measures. As the *Posecai* Court found of Sam's, the record of this matter does not support the majority's finding that Mr. Goldstein met his burden of proving that Leisure Management

---

[11] In *Espinosa*, causes of action were asserted under both strict liability, although there was no specific reference to La. C.C. art. 2317.1, and general negligence theories.

owed a duty to protect him from the criminal acts of third parties under the facts and circumstances of this case. *See Posecai*, p. 9, 752 So.2d at 768 ("[t]he plaintiff has the burden of establishing the duty the defendant owed under the circumstances."). Nor does the record evidence demonstrate that the Chateau Orleans' security measures were insufficient, or that extra security measures were warranted, because the record is void of any evidence that the Chateau Orleans, and the area surrounding it, had experienced any similar incidents in its past.

Accordingly, in my opinion, the trial court properly granted the judgment not withstanding the verdict, and I would affirm that judgment.