NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-106

STATE IN THE INTEREST OF

E.A.F.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-2016-943
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

AFFIRMED.

**Jane Hogan**
**Hogan Attorneys**
**310 North Cherry Street**
**Hammond, LA   70401**
**(985) 542-7730**
**COUNSEL FOR APPELLANT:**
**J.F.**

**Diane E. Cote**
**825 Kaliste Saloom Road**
**Brandywine III, Room 150**
**Lafayette, LA   70508**
**(337) 262-5913**
**COUNSEL FOR APPELLEE:**
**State of Louisiana, Department of Child and Family Services**

**Brittany Edwards**
**Attorney at Law**
**100 S. Louisiana, Suite 500**
**Abbeville, LA 70510**
**(337) 740-8885**
**COUNSEL FOR APPELLEE:**
**E.A.F.**

**Franchesca L. Hamilton-Acker**
**Tia Benton**
**Kimberly Latigue Arvie**
**Acadiana Legal Service Corporation**
**Post Office Box 4823**
**Lafayette, LA   70502-4823**
**(337) 237-4320**
**COUNSEL FOR OTHER APPELLEE:**
**E.A.F.**

**Nicole M. Guidry**
**Attorney at Law**
**100 S. Louisiana, Suite 500**
**Abbeville, LA   70510**
**(337) 740-2149**
**COUNSEL FOR OTHER APPELLEE:**
**J.R.**

**Donald Dale Landry**
**District Attorney**
**Dinah Sledge Cain**
**Assistant District Attorney**
**Tracey Davenport-McGraw**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, LA   70502**
**(337) 232-5170**
**COUNSEL FOR OTHER APPELLEE:**
     **State of Louisiana**

**Casa Coordinator**
**c/o Casa of SoLa**
**215 E Pinhook Road**
**Lafayette, LA   70501**
**(337) 268-5111**
**COUNSEL FOR OTHER APPELLEE:**
     **CASA of SOLA**

**PERRET, Judge.**

Following a one-day hearing, the trial court made a factual determination that J.F., the biological father of E.F., had "failed to substantially comply with his case plan, including: Failing to have demonstrated an ability to care for the child over the last five years."[1] J.F. now appeals the October 11, 2021 judgment that terminated his parental rights to his minor child, E.F.[2] For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY:**

According to the March 3, 2021 Petition for Termination of Parental Rights and Certification for Adoption, E.F. was born on May 4, 2016, and has been in the custody of the Department of Children and Family Services ("DCFS") since September 27, 2016, "on the grounds of neglect and that the child was born substance exposed and was adjudicated 'Child in Need of Care' on October 26, 2016." The petition states that E.F. "is currently residing in St. Martin Parish, Louisiana[,] with adoptive foster parents." The petition requests for the parental rights of J.F. to be terminated pursuant to La.Ch.Code art. 1015(5) because he has "failed to provide significant contributions to the child's care and support for any period of six consecutive months" and has "failed to maintain significant contact with the child by visiting her or communicating with her for any period of six consecutive months." The petition also requests for the parental rights to be terminated under La.Ch.Code art. 1015(6) for the following reasons:

> (a) The father has repeatedly failed to comply with the required program of mental health and/or substance abuse treatment,

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor child involved in the proceeding.

[2] The trial court previously terminated the mother's, J.R.'s, parental rights on July 30, 2019, a ruling that was not appealed and is now final.

individual therapy and rehabilitation services provided in the case plan.

(b)  The conditions that led to the removal or similar potentially harmful conditions continue to persist.

(c)  The father has failed to cooperate in the completion of the case plans designed for reunification of the family.

(d)  The father suffers from mental illness and/or substance abuse issues which render him unable and/or incapable of exercising parental responsibilities without exposing the minor child to a substantial risk of serious harm, based upon expert opinion[.]

(e)  The father has failed to refrain from criminal activity and has been arrested and charged with criminal damage to property, aggravated criminal damage to property; illegal use of a weapon; and on or about September 24, 2020[,] he was arrested with 2 counts of Aggravated Assault with a firearm and 1 count of contributing to the delinquency of a Juvenile.

After a hearing on September 29, 2021, the trial court found that the DCFS satisfied its burden of proof under the "Louisiana Children's Cod[al] Articles 1015(5) and 1015(6), in regard to the father, [J.F.], that at least one year has elapsed since the child, [E.F.], was removed from the father's custody pursuant to a court order" and that J.F. has "failed to substantially comply with his case plan." Specifically, the trial judge found: (1) J.F. failed to demonstrate an ability to care for E.F. over the last five years; (2) J.F. was unable to learn the specific medical needs, care and ability to put those in place for E.F.; (3) J.F. had limited resources that rendered him incapable of exercising parental responsibilities; and (4) J.F. failed to demonstrate to the court, over the last two years, a change in his parental abilities. The trial court found that "there is no reasonable likelihood of compliance with the case plan in the near future" and that E.F. "is flourishing in the care of the foster parents." Accordingly, the trial court ruled that it is in the best interest of E.F. for the parental rights of J.F. to be "permanently and irrevocably terminated."

2

In his lengthy oral reasons for terminating J.F.'s parental rights to E.F., the trial judge stated:

> So ordinarily, in a case like this, I would take the matter under advisement, but today I'm not because I want Mr. [J.F.] to hear why and where my thoughts are. So the first thing I want to tell you, Mr. [J.F.], is that you're certainly a fighter. There is no doubt that you have a longing to parent your children. You have, in this matter as well as the other matters, demonstrated to me a desire, at least, to try to be the best parent you can be.

> My problem in this case from the beginning, is that I think there are limited resources, and it's not your fault. Like I said, you talk about learning on the fly, and learning from your children, and all those things. I have no doubt that you have. But there are certain things that I don't know that either you have been able to learn or that you are capable of . . . . And two years ago, in '19, at the second termination of your parental rights, your lawyer advocated for you in a manner that you should be very proud of. And you, at that time, were on the fence of me terminating your parental rights then. And I was prepared to do that, but I gave you an opportunity to show me from that point forward that I was wrong, that this young child with these incredible special needs could be handled -- and I don't mean to embarrass you -- by someone who didn't necessarily possess all the skills that others might. And, unfortunately, for you, you haven't. You have not, in those two years, been able to show me that anything has changed to demonstrate that I believe you can care for this child with enormous special needs. I know Mr. Dangerfield [J.F.'s legal counsel] wants me to believe that [E.F] has done better, which she has. And in that foster home, this child has grown from a child that almost perished to a child that is now doing well. But she still has huge needs. At this time, Christine Dugas says she is functioning a year or more below her chronical age of five. She is being referred to yet another doctor, Dr. Julie McMurphy, for an evaluation of autism on top of her heart, her gastro, and all of her other needs. These are needs that need to be handled by someone with great ability and skills.

> During this two-year period, you've been arrested twice. You spent two months in jail. Do I take from that that you are criminally responsible for those two events? I can't yet because they haven't been proven. But what I can say, you find yourself in a position to be arrested, which gives me some concern for your children, whether you're guilty or not guilty, being involved in a situation and an issue that causes that.

> At your visits, clearly, and again maybe not your fault, while there's a bond that you have with your child, your child is not bonded to you in the same manner that a five-year-old could be or should be

bonded. The visits, whether they're in the park, whether they're in the office, they're just not the demonstration of those things.

One of the things that concerns me greatly, and I will tell you, I was called last week to remove your other two children. I didn't do it, but the only reason I didn't do it is because the offense that you were charged in September -- September 11, 2021, has not been proven. And the department couldn't prove to me that it occurred at that time. But I will tell you, if it's proven, you've got a heck of a mountain to climb. I've talked to Mr. Dangerfield about what I think the department should do between now and the time of that, and that's enter into some type of safety plan where your mom's involved and everything else; because if one thing happens between now and then, I'm going to either remove those children or place them somewhere else. I'm very concerned, Mr. [J.F.] about some of the activities that are going on. And -- so that and the fact that your two boys -- the two children at home have missed an enormous amount of time since 2019, when I had this termination until now, that causes me great concern in an ability to parent. It causes me a lot of concern and it's one of the main factors that I believe that the termination for the parental rights of [E.F.] is in the place that it needs to be.

You've worked many aspects of your case plan, but over the last five years, this child has attached to the foster parents. I believe that because of those special needs, and the ability for you to demonstrate to me the ability to carry the parenting for that child, it is for those reasons that I, today, terminate your parental rights with regards to [E.F.].

On October 15, 2021, J.F. filed a motion for a new trial. After a hearing on December 6, 2021, the trial judge denied the motion. J.F. now appeals, alleging the following three assignments of error: (1) the trial court erroneously terminated his parental rights due to a failure to substantially comply with his case plan; (2) the trial court erred by finding termination was in the best interest of the child; and (3) the trial court erred in denying the motion for new trial.

**STANDARD OF REVIEW:**

"A trial court's findings on whether or not parental rights should be terminated are subject to the manifest error standard of review." *State in the Interest of J.K.G.*, 11-908, p. 5 (La.App. 3 Cir. 1/11/12), 118 So.3d 10, 14. "Moreover, whether a

4

parent has complied with a case plan, the expected success of rehabilitation, and the expectation of significant improvement in the parent's condition or conduct are all questions of fact that may not be set aside in the absence of manifest error or unless clearly wrong." *State in the Interest of O.L.R.,* 13-616, p. 3 (La.App. 3 Cir. 11/6/13), 125 So.3d 569, 571. Under the manifest error standard, the appellate court does not decide whether the factfinder was right or wrong; rather, the appellate court is required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. *State in the Interest of C.E.,* 15-555, 15-556 (La.App. 3 Cir. 10/7/15), 176 So.3d 755.

**DISCUSSION:**

In *State in the interest of D.H.L.,* 08-39, pp. 4-5 (La.App. 3 Cir. 4/30/08), 981 So.2d 906, 910 (footnotes omitted), this court discussed the State's burden of proof in termination of parental rights proceedings as follows:

> Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.,* 02-2089 (La. 1/28/03), 837 So.2d 1247; La.Ch.Code art. 1035(A). "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." *State ex. rel. J.M.,* 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).

Accordingly, in order to terminate parental rights, the State must first establish at least one of the statutory grounds enumerated in La.Ch.Code art. 1015 by clear and convincing evidence. Upon satisfying this evidentiary burden, the State must then show that termination of parental rights would be in the best interest of the child.

Louisiana Children's Code Article 1015 sets forth the following pertinent grounds for termination of parental rights:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> . . . .
>
> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036 sets forth the necessary proof of parental misconduct and provides, in pertinent part:

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

6

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

. . . .

D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

**ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:**

In his first two assignments of error, J.F. argues the trial court erroneously terminated his parental rights due to a failure to substantially comply with his case plan and in finding that termination was in the best interest of E.F. J.F. argues the trial court erred in finding that he lacked the skills to care for E.F. and that there was no expectation of improvement in the near future when the record reflects that he remained compliant with his case plan for nearly five years. In support of this argument, J.F. alleges he maintained contact with DCFS, attended family team

7

meetings, completed two different substance abuse treatment programs, completed a mental health evaluation, and completed a parenting course.

Based on a review of the entire record before this court, we disagree. This matter has been before the trial court for over five years and the State sought to terminate J.F.'s parental rights on three separate occasions. The trial court was unwilling to terminate J.F.'s parental rights at the first two attempts by the State despite evidence that J.F. was not in compliance with his case plan. As the trial judge noted, after denying the State's petition to terminate J.F.'s parental rights on April 9, 2018, "Mr. [J.F.], I also don't think you've totally worked your case plan by any means." Again, after denying the State's second petition to terminate on July 30, 2019, the trial judge stated:

> In this case, the Court finds that, while Mr. [J.F.] has not done all those things necessary in his case plan, I do not believe that the department has carried its burden in showing that it is not reasonable in the foreseeable future for Mr. [J.F.] to meet those portions of his case plan that have not already been met. Yes, he has not made his contributions. Has he been consistent in his employment? No, he hasn't. . . . .
>
> . . . .
>
> Substance abuse. I think he has addressed them. Is he perfect in his substance abuse obtaining [sic]? No, he's not. And that's, certainly, something Mr. [J.F.] is going to have to work on. . . . Could he be more prompt on his visits and on his other things that he's supposed to do? Yes, he should and he could.

Following the dismissal of the State's second petition to terminate J.F.'s parental rights, the trial judge stated that "it is now incumbent upon the department to put reunification as a primary goal, which . . . means visits need to be changed, and that [the] department needs to move towards reunification." Thereafter, Ms. Latayna Roberts, the case worker with DCFS, provided correspondence to the trial judge on its plan and goal of reuniting E.F. with J.F.

8

According to Ms. Roberts' October 7, 2019 report on the case plan of reuniting E.F. with J.F., "[a] structured decision making reunification assessment was completed on Mr. [J.F.,]" and "[t]he results of the assessments gave Mr. [J.F.] a Very High rating, indicating that [E.F.] would be at Very High risk of abuse/neglect if returned to his home at this time[.]"  J.F.'s case plan consisted of "housing, employment, family visitation, parental contributions, and substance abuse evaluation and compliance, and random drug screens."  Ms. Roberts continued to provide reports to the trial judge throughout the year with the December 1, 2020 report being the last filed in the record prior to the third termination hearing.  In that report, Ms. Roberts noted the following facts: (1) J.F. "is not employed at this time[,]" but that "he is in the process [of] applying for disability[;]" (2) "he has not provided verification that he has paid parental contributions during this reporting period[;]" (3) he "was arrested on September 24, 2020[,] . . . [and] charged with 2 counts of Aggravated Assault with a Firearm and 1 count of Contributing to the Delinquency of a Juvenile[;]" and (4) he "has a hold for St. Martin Parish . . . [and] is currently in jail at Lafayette Parish Correctional Center . . . [and] [t]he agency does not have an expected release date for Mr. [J.F.]"  The report also states that E.F. has been "in foster care for 51 months" and that J.F. "has not physically visited with [E.F.] since in March 2020."  In regard to the health of E.F., the report states that she "is currently under the care of an Ophthalmologist, Pulmonologist, Gastroenterologist, Neurologist, Cardiologist, Audiologist and ENT" and that she "receives services through Acadia Parish School Board with a special instructor and speech therapist that meets with [her] weekly."

At the September 29, 2021 termination hearing, the State called the following witnesses to testify:  (1) Leon Winters, a licensed clinical social worker; (2) Ms.

9

Roberts, the case worker for J.F.; (3) Kathryn Viator, a foster care worker and case worker for J.F.; (4) Ashley Taylor, the case worker for E.F.; (5) Lauren Aillet, a teacher with the Lafayette Parish School Board; (6) Quindalyn Charlot, E.F.'s teacher at the Ross Headstart program; (7) and Cassandra McAlister, the current case worker for J.F. J.F. was also called as a witness.

Mr. Winters testified that he met with J.F. on at least three occasions but gained the most information from J.F. in their one hour, in-person assessment on June 16, 2021. When asked his impression of J.F.'s parental capacity during his visitation with E.F., Mr. Winters testified as follows:

> A. So we did a court ordered monitored visitation with him [on August 5, 2021], and just a synopsis of it, he did walk in a little late and then they went into the room, and it seemed like they were engaged, it seems like there's a bond there; however, the child [E.F.] proceeded to exit the room quite a few times, well, at least twice. And upon exit, it seemed like he was not --
>
> . . . .
>
> A. While there is a bond and there was positive engagement in the visitation -- during the visitation, at any point in time when [E.F.] needed to leave or she wanted to leave the room, there was not a lot of parenting redirection that was taking place to get her back in the room or to follow those directions.

Ms. Roberts testified that she was the case worker from August 2019 through December 2020. During that time, Ms. Roberts testified that J.F. was arrested on September 25, 2020, and was incarcerated until December 1, 2020. Ms. Roberts testified that J.F. failed to provide her with any proof of employment but that he was receiving Temporary Assistance for Needy Families ("TANF") benefits and Supplemental Security Income ("SSI") benefits on behalf of his other two minor

10

children.  Ms. Roberts testified that J.F. missed six[3] of the scheduled family visits in 2019-2020 without providing a reason for his absence.  When asked for her observations during J.F.'s visits with E.F., Ms. Roberts testified:

> A.     For the visits -- the majority of the visits, he would either show up late or end the visit early.  Quite a few of the visits he was on the phone, not really -- very little engagement with [E.F.].  Sometimes he would bring his children to the visits, which we asked to limit that.  One, was a concern for excessive absences for one of the children, but also it was for us to give us an opportunity to observe just him and [E.F.].  A lot of the visits it was just more so [E.F.] doing what she wanted to do, not a lot of re -direction.  A few of the visits, he did bring things for her.  Sometimes whenever we would have an opportunity to talk to him about, like, you know, these are some of the things that we're looking for you to do, he would try to implement them, but the majority of the visits it was a lot of the times he was on his phone and there wasn't a lot of engagement with [E.F.].

When asked if there were times when J.F. did not show up when asked to do random drug screens, Ms. Roberts testified as follows:

> A.     Yes, there were a couple of times when we requested random drug screens, he would either state that he was -- he had something going, he was too busy to go and do the drug screens, or he had an appointment.  And then -- and then there was another incident in August of 2019 where we instructed him to go for 1:00 -- before 1:00; he showed up at 4:25, five minutes before the facility was to close.  Wasn't able to collect the sample.

Ms. Roberts was also asked about the school attendance records of J.F.'s older son and whether there was any concern regarding E.F.'s schooling if she would be returned to the home.  Ms. Roberts testified as follows:

> It did raise a concern that if we're not able to be consistent with [J.F.'s son's] attendance, if it would be the same with [E.F.], especially with her medical issues that she has going on and the stability of being in that environment, so it did raise some concerns for the agency.

---

[3] Ms. Roberts provided the following dates of scheduled family visits that J.F. missed without reason:  October 23, 2019; November 27, 2019; December 11, 2019; February 26, 2020; April 25, 2020; and April 1, 2020.

When questioned whether J.F. had been in substantial compliance with his case plan, Ms. Roberts testified that "[t]hroughout the time that [she] had the case, there were parts of the case where he was compliant and there were some parts where he kind of fell off, so it was kind of up and down for his compliance." Ms. Roberts testified that despite the case plan requiring proof of legal employment, J.F. failed to provide proof of obtaining legal employment during the time she had the case.

Ms. Viator began working with J.F. in December 2020 and officially replaced Ms. Roberts as the case worker in January 2021. Ms. Viator testified that on September 11, 2021, J.F. was charged with attempted second-degree murder with a firearm and disturbing the peace by fighting and possession of unregistered weapon. In regard to the supervised visits between J.F. and E.F., Ms. Viator testified as follows:

> When visits have been held between Mr. [J.F.] and [E.F.] at the park, typically, it consists of Mr. [J.F.] watching [E.F.] play. I've observed him playing on his phone, not being very active with E.F. as she's playing. She's tried to run near the street, across the playground, and there's no sense of urgency for Mr. [J.F.] to attempt to make sure that she's protected, that she's safe, which is why we've had to move visits back to the office because it is a safety concern and Mr. [J.F.] was not ensuring that, you know, he watched her well enough during those visits. Also when he brings -- when he has brought his other two children to the visits, majority of those, those children interact with [E.F.] and Mr. [J.F.] observes that interaction rather than actively participating in the visits. Visits that have been held at our office, oftentimes, [E.F.] is hesitant to go with Mr. [J.F.] into the visitation room. If he brings her a toy or he brings her candy or something like that, she is -- she will go with him in the room. She appears to be anxious during their time together, often looking out of the window. She has asked the worker and myself if her mom, which is what she refers to the foster parent as, is going to come back and get her from the visit. She has tried to leave the room several times, she has left the room several times, just wanting to leave. Again, Mr. [J.F.] will minimally interact with her when she's in the visitation room for visits. When he does bring things for her to do, he will, for a short period of time engage with her, but he plays on his phone, he's not actively involved. If she leaves the room, he doesn't try to bring her back into the room, he doesn't make attempts, you know, to continue to get her

to want to be in the visitation room with him. He has ended visits early[.]

Ms. Viator also testified that "[o]n a regular basis, Mr. [J.F.] was consistently late to his visits, and oftentimes he ended the visits extremely early, he did not stay the full hour."

Ms. Taylor testified that she has been the case worker for E.F. for the past two years. She testified that there have been twenty-eight visits scheduled since she has had the case and that J.F. "has missed nine of them, six of them ended early, eight of them he arrived late, . . . three visits he stayed the entire time, [and] one of the visits was canceled due to COVID exposure." When asked about the interaction during the scheduled visits between J.F. and E.F., Ms. Taylor testified as follows:

> The visits, the interaction was very minimal. If it was at the park, there obviously were a lot of safety concerns when it comes to [E.F.] running towards the road, running towards the parking lot, running towards the pond, and myself and the foster parent did have to intervene one of the visits to protect [E.F.]. Mr. [J.F.] does stay on his phone. During the park visit, he was on his phone three different times. I did go and talk to him about getting off his phone, and he told me that he can still watch [E.F.] while being on his phone. Visits at the office, same thing, he will text a majority of the time, [E.F.] is trying to exit the room, she'll stand by the door or she'll look at the parking lot to see if she can see her caretaker's vehicle.

When asked whether E.F. appears to have a bond with J.F., Ms. Taylor responded "No, she does not." When asked specific questions regarding the bond between E.F. and J.F. and the bond between E.F. and her foster parents, Ms. Taylor testified as follows:

> Q. Would you say, based on your observation of those interactions, [E.F] has a closer bond to her father, Mr. [J.F.], or does [E.F.] have a closer bond with her foster parents?

> A. She definitely has a closer bond with her foster parents; she's been there for three and a half years, so that's who she considers her mom and dad.

13

Q. And so have you ever witnessed or observed [E.F.] calling her foster parents "Mom" and "Dad"?

A. Yes.

Q. And as far as the visitations with Mr. [J.F.] and [E.F.], have you witnessed him cuddling or holding the child?

A. No.

Q. Have you witnessed affection or love?

A. No.

Q. As far as [E.F.]'s attention, has she ever gravitated towards her father by initiating any affection, such as a hug?

A. No. The only time she would gravitate would be if he has a treat or a snack to give her.

Q. Okay. Outside of the gumballs, the kinetic sand, and the nail polish, has Mr. [J.F.] ever provided any clothing for [E.F.]?

A. Yes, he has. That's the clothing that smells, you know, the smoke.

Q. Okay. Has he ever provided any medical care or assistance with [E.F.]?

A. No, not to my knowledge.

Q. Has he ever provided any educational materials for [E.F.] due to her delay?

A. No.

Ms. Aillet testified that she works at the Lafayette Parish School Board and was the itinerant teacher for J.F.'s six-year-old son. Although Ms. Aillet testified that she was concerned about J.F.'s son's schooling, she noted that it was common for families to have problems with WiFi during Covid and that virtual learning was an adjustment, especially considering that J.F.'s son was starting his first year of school.

Ms. Charlot testified that she taught E.F. for a year at Ross Headstart, a school located in Crowley, Louisiana. When asked about E.F.'s behavior during that year, Ms. Charlot testified as follows:

A. On a regular basis, it was good when she didn't have home visits. When she had home visits, I seen [sic] her body language different when she would come and have home visits. On a daily basis, it was fine without home visits, but I could tell when she would come back from a home visit, because her body language was different[.]

Q. What was her behavior?

A. She didn't want to do nothing. I had to encourage her to do her work; rub her back and say everything is going to be okay, let's do your work for today. And after I did that, she did.

. . . .

Q. So when you started observing these behaviors, did you confirm with the foster parents about -- and you said home visits, did you mean with her father?

A. Yeah, with her father. When she had the visits with her father, she would have different language when she would come back to school. She wouldn't want to do her work, and I'd have to rub her say, come [E.F.] let's do your work, encourage her to do it because I knew she had a visit with him. But other than that, if she wouldn't have a visit it was different, she would do her work with no problems or anything.

Ms. McAlister testified that she is the current case worker for J.F. and that she was able to observe one visit between J.F. and E.F. on August 5, 2021. When testifying to her observations on that day, Ms. McAlister stated:

[J.F.] was trying to play with [E.F.] [while] drawing, but it was minimal. During the visit, she tried to get up, she did get up, she said she didn't want to be there, she started searching for the door, he did get up with her, but he wasn't trying to get her to sit back down. He actually was walking beside her and opened the door for her to leave out. At that time, . . . Mr. Winters and I walked out of the observation room and [we] walked into the break room, the lobby area, where Mr. [J.F.] and [E.F.] were sitting, and Mr. [J.F.] did say that [E.F.] wanted to leave out the room, she didn't want to be in there. Mr. Winters suggested, you know, bring her back in there and try to visit with her. So they went back in there; we went back into the observation room.

He started trying to engage with her again, but she stopped writing and she said she was ready to go. She went towards the door; she left out again. There was no redirection or anything by Mr. [J.F.] trying to stop her from leaving or anything[.]

J.F. was the last witness to testify at the hearing. J.F. testified that he has two sons, ages ten and six who are presently being home schooled. He acknowledged that he receives SSI benefits because the ten-year-old is ADHD and the six-year-old is autistic and that his source of income is primarily through the SSI benefits. J.F. testified that his parents assist him with his boys and that he receives $707.30 in social security each month. When asked whether he had difficulty in redirecting E.F. during their visits, J.F. testified:

A.      Not at all. I don't feel like that's true because the agency has a funny way of showing their [sic] care. I don't – it's been a long time, you know, I did this for a long time, so it's hard for me to say, oh, I can't redirect her when it's been years I been redirecting for all this time. It's just that setting. It's just that setting, she's not comfortable with anymore. I redirect her as much as I can, like, I talk to her and I try to tell her everything what's going on to make her realize or understand what she [doesn't], but she's still in her own mindset. And I'm not the type to, like, force, pull, shove, and stuff like that, so I enjoyed my park visits as much as I could with no safety issue.

J.F. acknowledged that he had been arrested in September 2020 and incarcerated for "about three months" but explained that his parents cared for his children during that time. J.F. also testified that he was arrested on September 11, 2021, but was bonded out of jail the following day. When asked whether he has complied with all components of his case plan, J.F. testified:

Yes, sir, I feel like I complied above and beyond because the agency always finds something to put there when I don't really have anything left. Like, my FTM [Family Team Meetings] that they said I missed, I really was there and she only mentioned, like, three or four things that she needed, random drug screen, home visits, attend doctor visits, and verification of my lease, I believe. Four things. I thought that was my case plan. I don't have a printed out one. At least not anymore.

16

J.F. acknowledged that he has had transportation issues in the past but testified that he would get E.F. to her necessary doctor appointments by seeking help from his family or using the local transit system.

Upon consideration of the full record and exhibits, we find the State satisfied its burden of demonstrating that J.F. was unable to sufficiently satisfy the requirements in his case plan in regard to employment, family visitation obligations, and his parental contributions. The record also provides support for finding that J.F. is unable to provide a safe, stable home environment considering he was arrested on September 24, 2020, and remained incarcerated until December 2020, and was arrested again on September 11, 2021. Accordingly, we cannot say the trial court was manifestly erroneous in finding that J.F.'s parental rights should be terminated under La.Ch.Code. art. 1015(6).

Additionally, we find no error in the trial court's determination that termination of J.F.'s parental rights is in the best interest of E.F. As stated by the Louisiana Supreme Court, our laws are not intended "for children to remain in foster care permanently." *State in the Interest of J.M.,* 02-2089, p. 16 (La. 1/28/03), 837 So.2d 1247, 1257. "Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child." *Id.* Further, in *State in the Interest of C.F.*, 17-1054 (La. 12/6/17), 235 So.3d 1066, 1075 (citations omitted), the supreme court recently addressed the balance between the interests of the parent with the interests of the child, and stated:

> The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of

17

secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them.

The trial judge found that it was in the best interest of E.F. to remain in the stable foster care home where she has been thriving and could be adopted. Considering the evidence in the record demonstrating grounds for termination and that termination of J.F.'s parental rights is in the best interest of E.F., we find no error in the trial court's judgment terminating J.F.'s parental rights and finding E.F. free and eligible for adoption.

## ASSIGNMENT OF ERROR NUMBER THREE:

In his third assignment of error, J.F. asserts the trial court erred by denying his motion for new trial. He contends the State failed to prove that the allegations raised in his termination petition by clear and convincing evidence and that "one set of [his] criminal charges ha[ve] now been completely dismissed."

Louisiana Code of Civil Procedure Article 1972 lists the peremptory grounds for a motion for new trial, as relevant herein:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:
>
> (1) When the verdict or judgment appears clearly contrary to the law and the evidence.
>
> (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.

Further, La.Code Civ.P. art. 1973 addresses the discretionary grounds for a motion for new trial, stating that "[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law." In order to meet the burden

18

of proof on a motion for new trial on the basis of newly-discovered evidence, J.F. must prove "that the evidence was discovered after the trial; that the new evidence is not cumulative; that the new evidence would tend to change the result of the case; and that the new evidence could not have been discovered, with due diligence before the trial was completed." *Bennett v. Porter*, 10-1088, p. 15 (La.App. 3 Cir. 3/9/11), 58 So.3d 663, 674. In reviewing a trial court's ruling on a motion for new trial, the applicable standard of review is whether the trial court abused its discretion. *Pitts v. La. Med. Mut. Ins. Co.*, 16-1232 (La. 3/15/17), 218 So.3d 58.

At the close of the hearing, the trial court issued oral reasons for denying J.F.'s motion for new trial, stating, in pertinent part:

> Mr. [J.F.] has done many of the things in his case plan, but there's a difference between compliance and understanding what is being done in a training or in a parenting. I think it's more than just attending a program. It's about understanding and being able to put in place those things that are taught in a parenting or a mental health training. This case has gone on for five years. I have started a termination and stopped a termination. I have started a termination and at this point I believe this child [E.F.] is entitled to permanency. I do not believe that many of the things that are being asked of Mr. [J.F.] can be accomplished. I do not believe he can grasp all of the things necessary to parent this needy child. I believe that the department has shown that he has failed to understand portions of his case plan that are required in order to parent this child. I think he exhibits poor insight at many times. It's a compilation of many things during the case -- during the time of the case that has caused me to have concerns. The visits were problematic. Housing is problematic. Clearly, the child is bonded and feels that the current caregivers are who she identifies as her parental figures. I do not believe that the child has bonded with Mr. [J.F.]. I do believe that it is not in the best interest of this child to reunify with Mr. [J.F.]. And for those reasons, the Court denies any request for a new trial at this time.

As is evident from the above-quoted oral reasons for judgment, the trial judge considered all of the evidence presented over the last five years of this case. Given all the circumstances, and the fact that E.F. has bonded with her foster care parents

over the past several years, we find no abuse of discretion in the trial court's denial of the motion for new trial.

For the foregoing reasons, the trial court's judgment permanently terminating J.F.'s parental rights to E.F. is affirmed. The judgment denying J.F.'s motion for new trial is also affirmed. Costs of this appeal are assessed against J.F.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.